```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
                         07-CV-4929(JMR/JJK)
```

Katie J. Felder, as trustee  )
for the next of kin          )
of Dominic Aries Felder      )
                             )
            v.               )           ORDER
                             )
Jason King, Lawrence         )
Loonsfoot, and City of       )
Minneapolis                  )

This case arises out of the tragic death of Dominic Aries Felder. He died on September 20, 2006, at the age of 26, from gunshots fired by Minneapolis Police Officers, Lawrence Loonsfoot and Jason King. Katie Felder, his mother, and trustee for the next of kin, claims King and Loonsfoot are liable for assault, battery, and the use of excessive force. She further claims the City of Minneapolis's policies and improper employee training led to his death.

Defendants move for summary judgment, claiming qualified and official immunity, and maintaining plaintiff failed to establish a cause of action against the City of Minneapolis ("the City"). Plaintiff opposes summary judgment, asserting genuine issues of material fact preclude granting defendants' motion. Defendants' motion is granted in part and denied in part. Summary judgment is granted as to plaintiff's Monell claim against the City. Summary judgment is denied as to defendants' claims of qualified and official immunity. Plaintiff's assault, battery, and use of

excessive force claims against the Officers will proceed to trial.

I. Background[1]

Dominic Felder ("Felder") was just over five feet tall and weighed 155 pounds. He worked full time as a telemarketer. He lived with Tiana Wilson ("Wilson"), his significant other, and their daughter, Destiny.

On September 20, 2006, Felder's relatives were concerned about his mental health. Felder told Wilson he believed people were trying to kill him. Wilson called her mother, Teri Williams, and asked her to come over and "pray with [Felder] because . . . he [was] not all there." (Compl. ¶ 20.) When Wilson asked Felder what she could do, he told her "he wanted to be helped." (Compl. ¶ 21.)

Wilson also called a family friend, Pangia Vang, for advice. At 11:30 p.m. Vang called 911, saying Felder was experiencing a "mental attack." The 911 operator asked if Felder had a history of mental health problems. Vang did not know of any.

Four minutes later, Felder's next door neighbor called 911 to report a "domestic dispute," and said Felder was pounding on his door and yelling he would kill "a bunch of people." Seconds later,

---

[1] The parties significantly disagree about the events leading to Felder's death. For purposes of this motion, premised on Rule 56 of the Federal Rules of Civil Procedure, the Court views all facts most favorably to plaintiff, the non-moving party. "Facts" set forth in this Opinion are taken from the parties' pleadings, and are not determinations on the merits.

Williams phoned 911 asking for a police squad and reporting Felder was "crazy . . . talking crazy saying all kinds of crazy things." No one who called 911 claimed Felder had a weapon.

After the neighbor's 911 call, Officers Loonsfoot and King were dispatched to "check on a secondhand report of a domestic argument." Minutes later, police dispatch relayed the message that "the ex-boyfriend involved now is out in front threatening to kill a resident and her son." The Officers were given Felder's physical description, but no other information, before they arrived at the scene.

    A.   <u>Witness Accounts</u>

        1.   <u>The Officers' Accounts</u>

When the Officers arrived, Felder voluntarily approached the police car and told Loonsfoot, "I need to talk to you guys." Loonsfoot stated he would first need to pat Felder down for weapons before they could speak. Felder replied "ain't got nothing," pulled up his shirt, and began to back away. Felder then turned and jogged away from the Officers. Wilson and her mother watched from Wilson's front yard. According to Wilson, Felder jogged away as if in "slow motion."

Loonsfoot says Felder "put both hands towards the front of his waistband" as he ran, as though he was drawing a weapon, leading Loonsfoot to draw his gun. Wilson and Williams deny seeing Felder dig in his pants as if trying to pull something out.

Wilson and Williams approached the Officers when Felder began to run. King says Wilson yelled, "Don't shoot him, he ain't got no gun." (King Dep. 65:8-11.) Officer Loonsfoot states one of the women said Felder was "mental," and, "He just broke my window. You got to go get him." (King Dep. 64:24-25; Loonsfoot Dep. 59:8-23.) Wilson and Williams claim one of the Officers responded, "She want[s] us to get him, but she don't want us to shoot him." (Wilson Dep. 50:14-16; Williams Dep. 51:18-25.) Loonsfoot then holstered his gun, and the Officers began to follow Felder in their squad car. Wilson and Williams followed on foot.

When the Officers caught up to Felder, King drew his weapon and ordered Felder to the ground and onto his stomach. Felder complied immediately. King says he knelt next to Felder to cuff him, and began to holster his gun. Loonsfoot approached Felder with his hand on his holstered gun.

According to Loonsfoot, Felder began to raise himself up off the ground. (Loonsfoot Dep. 81:4-8.) Loonsfoot pushed down on his back as King straddled Felder's waist. Despite the Officers' efforts, Felder returned to a standing position, at which time Loonsfoot placed Felder in a headlock. Each Officer states they tried to force Felder to the ground. King claims he struck Felder twice in the head with the butt of his gun. The blows did not appear to faze Felder.

The Officers then wrestled Felder onto his stomach; Felder

immediately flipped over onto his back.  King sat on Felder's knees while holding his gun with both hands.  King says Felder reached toward his waistband again.  The Officers admit they never saw Felder with a weapon.

At this point, King says Felder grabbed his gun and "[pulled] it towards himself."  Loonsfoot, who was behind Felder, attempted to get King's gun, which was only inches away from his own face.  (Loonsfoot Dep. 104:13-18.)  King claims he and Felder engaged in a brief tug of war over the weapon.  King states he fired his weapon at Felder after realizing he could not get the gun.  (King Dep. 113:7-9.)

Thereafter, Loonsfoot says he rolled to Felder's side, jumped to his feet, and moved away from Felder and King.  Even after being shot, the Officers state Felder clung to the barrel of King's gun.  Loonsfoot claims he then moved behind King, facing Felder.  King then yelled, "He's got my gun," at which point Loonsfoot began shooting Felder.  Felder was shot six times, and, according to Loonsfoot, remained in the same position holding King's gun until he stopped firing.  By the time medical assistance arrived, Felder was dead.

    2.   William's and Wilson's Account

Williams and Wilson observed the altercation from across the street.  Wilson says she saw the Officers holding Felder up off the ground by his arms, as Felder begged the Officers to let him go.

Wilson heard one of the Officers say "get down on the ground." She then lost sight of Felder and heard the shots.

   B.  Medical and Forensic Evidence

      1.  Medical Evidence

Plaintiff argues the medical and forensic evidence contradicts the Officers' testimony. Officer King claims he shot Felder once in the chest area. Officer Loonsfoot claims he shot Felder six times while standing behind King facing Felder, who was sitting on the ground.

Plaintiff relies on the autopsy and the opinions of retired FBI Special Agent Fred Robinette. The autopsy report shows King's shot was not fired into Felder's chest, but actually entered Felder's groin. (Robinette Aff. Ex. 1, 6.) From this fact Robinette concludes, "Felder must have been lying on his back or his stomach when this shot was fired." (Id.) Robinette further opines, based on the autopsy report, that four of the shots fired by Loonsfoot entered Felder's body from behind. (Id. at 7.) One shot entered the back of Felder's shoulder, one entered the back of his arm, one entered the backside of his right chest, and one entered the back of his right forearm. (Id.)

Defendants counter with the expert analysis of Dr. Lindsey Thomas. Dr. Thomas concludes that, while King's shot and one of Loonsfoot's shots are consistent with the Officers' testimony, the "remaining gunshot wounds are inconsistent with Officers King and

6

Loonsfoot's description of Mr. Felder remaining in a sitting position until after Officer Loonsfoot's sixth shot was fired." (Lathrop Aff. Ex. 9, 3.)  Dr. Thomas suggests that the inconsistencies do not reflect perjured testimony, but simply "reflect the level of chaos and confusion that occurred during this shooting." (Id.)[2]

### 2. Ballistics Evidence

Plaintiff also offers the expert report of Richard Ernest, Forensic Ballistics Consultant.  Mr. Ernest analyzed the autopsy and gunshot residue report, as well as the physical evidence.  He notes "very little in the way of gunpowder particles" on Felder's clothing. (Ernest Aff. Ex. 1, 5.)  He found the lack of gunpowder "surprising" in light of King's statement that he shot Felder at close range.  Additional analysis also revealed gunshot residue on Felder's left hand, but none on his right.  This finding is inconsistent with Officer King's statement that Felder held the barrel of his gun with both hands. (Behrenbrinker Aff. Ex. 10.)

### 3. DNA Evidence

Finally, plaintiff points to DNA analysis.  While King reported hitting Felder in the head with the butt of his gun, examination did not reveal Felder's DNA on the bottom grip area or

---

[2] Dr. Thomas, a medical examiner, is apparently qualified as a pathologist, and – from her letter – appears to have a certain expertise in ballistics.  These qualifications do not make her an expert on perjury, and the Court gives no weight to her views in that regard.

bottom magazine of King's weapon.  (Behrenbrinker Aff. Ex. 8.) Plaintiff also cites an absence of injury to Felder's scalp – suggesting King did not strike him in the head.

Defendants counter, noting the Minnesota Bureau of Criminal Apprehension's DNA analysis found DNA consistent with Felder's on the gun's trigger guard, slide, equipment rail, and front sight. (Id.)  Defendants' expert also suggests the absence of a head injury from King's strikes may be because Felder's hair cushioned the blows, or King did not strike Felder forcefully.  (Lathrop Aff. Ex. 9.)

In short, plaintiff says the physical evidence is contrary to the Officers' version of the facts, while defendants claim opinions regarding "bullet trajectories are irrelevant to the issue before this Court."  (Defs.' Reply Mem. 6.)

C.  Procedural History

Plaintiff, Katie Felder, as trustee for Dominic Felder's next of kin, sued King, Loonsfoot, and the City of Minneapolis in Minnesota state court.  Count One of her complaint accuses King and Loonsfoot of using excessive force against Felder, in violation of 42 U.S.C. § 1983.  Count Three[3] accuses the City of maintaining unconstitutional customs or policies under which Minneapolis failed to train its officers and 911 operators in proper methods to

---

[3] Counts Two and Six are procedural claims asserting federal punitive damages and vicarious liability.

respond to mental crisis situations. She claims the City is liable because the crisis training it offers is voluntary, rather than mandatory. Counts Four and Five accuse defendants King and Loonsfoot of state law assault and battery.

On December 21, 2007, defendants removed the matter to federal court and filed for summary judgment seeking dismissal of all counts.

## II. Discussion

Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. See Anderson, 477 U.S. at 250.

### A. Section 1983: Qualified Immunity

Defendants move for summary judgment claiming qualified immunity. Qualified immunity shields officers from suit for official acts, as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A court is to resolve qualified immunity questions "at the earliest possible stage of litigation." Gorra v.

Hanson, 880 F.2d 95, 97 (8th Cir. 1989).

Prior to the Supreme Court's decision, in Pearson v. Callahan, 129 S. Ct. 808, 815 (2009), courts were mandated, by Saucier v. Katz, to engage in a structured two-step "sequence for resolving government officials' qualified immunity claims." This means the Court first decided whether "the facts alleged show[ed] the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001). Following this inquiry, a court had to determine whether the right violated was clearly established when violation occurred. Id. Pearson modified this formula, when the Supreme Court reconsidered Saucier's "rigid order of battle." As a result, district courts may "exercise their sound discretion in deciding which of the two prongs" to address first.

Given this choice, the Court opts for the Saucier procedure. Having done so, the Court finds plaintiff has asserted a clear violation of a constitutional right. "The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998). To determine the reasonableness of the Officers' seizure, the Court asks whether their actions were "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989). An officer's use of deadly force is subject to

this reasonableness requirement.  Tennessee v. Garner, 471 U.S. 1, 11 (1985).  The Supreme Court has held that, "where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  Id.

This case presents a clear jury question:  if the jury credits plaintiff's evidence, it could conclude the Officers' use of force was objectively unreasonable.  If the jury believes the Officers, there was no violation of Felder's rights.  The Officers have testified to one version of the facts.  Williams and Wilson offer contrary testimony.  A reasonable jury could well find the forensic evidence inconsistent with the Officers' testimony.  Six of seven shots fired into Felder do not facially match the Officers' testimony.  DNA evidence is, at best, equivocal.  Under these circumstances, a reasonable jury could find excessive force was used.

Having established a general right to be free from unreasonable seizure, the Court turns to whether the right at issue was clearly established at the time of the Officers' alleged violations.  See Saucier, 533 U.S. at 201.  The Officers deny clearly established law prevented them from using deadly force where they believed Felder "pos[ed] a significant threat of death or serious physical injury to the officer or others."  Hernandez v. Jarman, 340 F.3d 617, 622 (8th Cir. 2003) (quotations omitted).

11

The Officers swear Felder repeatedly dug in his pants and reached for his waistband as he jogged away from them, leading them to believe he had a weapon. They claim he resisted arrest, and struggled to a standing position after being ordered to the ground. The Officers state they believed Felder had a weapon, and was seeking to take King's weapon,[4] resulting in a legitimate fear for their own safety. The Officers deny that any case holds officers fearing death or serious injury are not allowed to use deadly force.

This argument proves too much. The fact that no opinion describes their specific situation does not mean that, in the absence thereof, their actions are approved. See Hope v. Pelzer, 536 U.S. 730, 739 (2002). Constitutional rights are clearly established when it is "sufficiently clear" that an officer would understand that his actions violate that right. Id. And, as stated by the Eighth Circuit Court of Appeals, "A right is clearly established when that right is so clear that a reasonable official would understand that what he is doing violates that right." Craighead v. Lee, 399 F.3d 954, 962 (8th Cir. 2005). Highly relevant to this case, in Craighead, the Eighth Circuit found officers have been on notice for nearly 20 years that "they may not

---

[4] It is not at all clear why a person who had a gun in his waistband, and two free hands to wrestle for a gun, would not use one of his hands to grab his own weapon, rather than engage in a wrestling match with a police officer.

12

use deadly force unless the suspect poses a significant threat of death or serious physical injury to the officer or others." Id. at 962.

For example, in Ribbey v. Cox, the Eighth Circuit affirmed a denial of qualified immunity to an officer accused of shooting an unarmed man. 222 F.3d 1040, 1041 (8th Cir. 2000). There, the officer approached a suspect's car with his weapon drawn after a high speed chase. Id. at 1041-43. The officer shot the suspect when he turned, as if to reach for a weapon under his car seat. Id. A genuine question of fact existed as to whether the officer had probable cause to believe the suspect reached for a gun, and the Eighth Circuit distinguished the case from situations where an officer had actually viewed a suspect's gun. Id. at 1043.

Here, the Court finds a genuine issue of fact, as in Ribbey, as to whether the Officers used deadly force when they should have known Felder did not present an immediate threat of death or serious physical injury. Summary judgment is inappropriate where plaintiff "challenges the officer's description of the facts and presents a factual account where a reasonable officer would not be justified in" his actions. See Arnott v. Mataya, 995 F.2d 121, 124 (8th Cir. 1993).

B. Monell Claim

In Monell v. Department of Social Services, the Supreme Court held a municipality may be liable to a citizen under § 1983 for an

unconstitutional deprivation of rights. 436 U.S. 658, 690 (1978). Here, plaintiff offers two bases to claim the City is liable for a deprivation of Felder's rights. First, plaintiff argues police policy led to Felder's death. See Ware v. Jackson County, 150 F.3d 873, 880 (8th Cir. 1998) ("A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an action pursuant to official municipal policy.") (quotations omitted). Second, plaintiff claims the City constitutionally erred in "its failure to properly train its employees." (Pl.'s Mem. Opp'n Summ. J. 40.)

     1.  Unconstitutional Policy

Plaintiff's complaint states the City has a policy "to inadequately and improperly train police officers, including the individual Defendants, regarding the use of unreasonable deadly force." (Compl. ¶ 65.) In particular, plaintiff claims the City's voluntary - as opposed to mandatory - training policy for Crisis Intervention Team training ("CIT") violated Felder's constitutional rights. Plaintiff states Felder suffered from a mental health crisis, yet neither Officer employed any de-escalation techniques in the absence of training on the issue. According to plaintiff, if the City required CIT training, the Officers would not have violated Felder's constitutional rights. The Court disagrees.

To establish Monell liability, the policy complained of must be the "moving force of the constitutional violation." Monnell,

436 U.S. at 694.  Where a city's policy is constitutional on its face, a plaintiff must show the policy's inadequacies "were a product of deliberate or conscious choice by policymakers." Szabla v. City of Brooklyn Park, 486 F.3d 385, 390 (8th Cir. 2007).  Here, plaintiff does not argue voluntary CIT training violates any constitutional right.  She argues, instead, that the "municipality should have done more to prevent constitutional violations by its employees" by requiring all officers to complete CIT training.  Id.

The Court finds plaintiff has failed to "make a submissible case of deliberate indifference."  Id. at 392.  When determining whether a city acted with deliberate indifference, courts look for "'clear constitutional guideposts' for municipalities in the area." Id. at 393 (quotations omitted).  Plaintiff cites no case requiring a city to provide mandatory crisis intervention training.  See id. (refusing to hold a municipal policymaker liable for a right that has not yet been clearly established).  In addition, plaintiff offers no evidence showing Minneapolis police officers have a history of violent encounters with those in mental crisis.  There is no showing the City refused to act on prior knowledge of unconstitutional acts by officers; it merely offers additional training to officers who seek it.  Such a policy cannot rise to the level of a constitutional violation.

   2. <u>Failure to Train</u>

Beyond faulting City policy, plaintiff claims the City failed

to train its officers and emergency communications center employees.  A city may be liable for failure to train employees where (1) the city's training practices are inadequate; (2) the city acted with deliberate indifference towards the rights of citizens when adopting its policies; and (3) the alleged deficiency actually caused plaintiff's injury.  Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996).  Again, plaintiff has failed to show the City acted with deliberate indifference causing Felder's death.

Plaintiff claims the City's failure to give CIT training to all of its officers violates § 1983 and demonstrates deliberate indifference.  She is incorrect.  To withstand summary judgment, she must show the City "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights."  Id. (citation omitted).  In light of the varied duties undertaken by police officers, it is not at all obvious that all officers deal with individuals in mental health crisis.  Most importantly, plaintiff cannot show that an officer trained in CIT intervention would have acted differently, or that a failure to provide the training caused the Officers to shoot and kill Felder.  Voluntary CIT training does not give rise to a failure to train claim.

Plaintiff's claim that the City's failure to train the emergency communications center employees violated § 1983 must also fail.  Plaintiff's brief does not discuss where the training

failed, how it could be improved, or even what is currently involved in training. The Court grants summary judgment on plaintiff's Monell claims.

### C.  State Law Claims

Under Minnesota law, a police officer is not liable for assault or battery unless the act was committed willfully or maliciously. In determining an officer's liability, a court asks whether an officer intentionally committed an act he should have known was prohibited. State by Beaulieu v. City of Mounds View, 518 N.W.2d 567, 571-72 (Minn. 1994). "Whether or not an officer acted willfully or maliciously is usually a question of fact to be resolved by the jury." Johnson v. Morris, 453 N.W.2d 31, 42 (Minn. 1990).

For the same reasons this Court denied summary judgment on the use of excessive force claim, summary judgment is denied on the state law tort claims. Disputed factual questions cannot be resolved on summary judgment, and must be left for the jury.

## III.  Conclusion

Plaintiff claims the Officers shot an unarmed man who complied with their orders and instructions. The Officers claim the decedent did not comply, and may have been reaching for a weapon or attempting to gain control of a police firearm in a fashion which directly threatened their lives. Each position is supported by evidence. Under these circumstances, the Court finds there are

unresolved issues of fact which must be resolved by a jury, thus precluding summary judgment or a finding of qualified or official immunity.  Contrariwise, there are no triable issues concerning the <u>Monell</u> claims, as to which summary judgment is granted.

Accordingly, IT IS ORDERED that

1.  Defendant's motion for summary judgment is granted as to Count 3 [Docket No. 14];

2.  Defendant's motion is denied as to the remaining counts [Docket No. 14].

Dated:  March 24, 2009

<u>s/ James M. Rosenbaum</u>
JAMES M. ROSENBAUM
United States District Judge
