1

4      KATIE J. FELDER, ETC

6           VS.

8      JASON KING, ET AL

14     ROUGH DRAFT OF DEPOSITION OF

16     RICHARD N. ERNEST, B.S.

18     TAKEN OCTOBER 7, 2010

4

1   32, 33, 35, 41, 42, 43, 44, 45, 46, 47 and 48, we're

2   objecting as prejudicial and as cumulative.

3       MR. BEHRENBRINKER: Okay. And then been

4   Plaintiff's Exhibits numbers 37, 38 and 39 by

5   agreement and stipulation are admitted into evidence.

6       MR. SKARDA: That's correct.

7       MR. BEHRENBRINKER: And just so the

8   record is clear, Plaintiff's Exhibit Number 49 is also

9   admitted into evidence?

10      MR. SKARDA: That's correct.

11      MR. BEHRENBRINKER: Okay. All right.

12  BY MR. BEHRENBRINKER:

13      Q   Could you please state your full name for

14  the record, sir?

15      A   Richard Neal Ernest. Neal is N E A L,

16  and Ernest is E R N E S T.

17      Q   Okay.

18      MR. SKARDA: Was he sworn?

19      MR. BEHRENBRINKER: Yes.

20      MR. SKARDA: Oh, I'm sorry.

21      THE REPORTER: It's been while awhile.

22  BY MR. BEHRENBRINKER:

23      Q   Mr. Ernest, is your occupation that of a

24  forensics ballistic consultant and laboratory

25  director?

78

1   the trajectory by positioning the reconstruction dummy
2   in a position that could recreate that type of a
3   trajectory or direction?
4       A   Yes, sir, that's correct.
5       Q   Okay. And does that reinforce your
6   conclusion that it just -- the testimony of Defendant
7   Loonsfoot and King, these three photographs that we've
8   been talking about, their version just could not
9   possibly have happened that way?
10      A   Yes, sir, that is correct. This is --
11  this is -- this is portraying what you would have to
12  have to actually get those trajectories.
13      Q   Okay.
14      A   As is seen at autopsy and seen in his
15  clothing.
16          But it stands in stark contrast to the
17  statements that were given by the officers in this
18  incident.
19      Q   Okay.
20          I'm showing you what's been marked as
21  Plaintiff's Exhibit 39. This is the report of the
22  examination of physical evidence by the Minnesota
23  Bureau of Criminal Apprehension.
24          Have you seen that report, sir?
25      A   Yes, sir, I have.

79

1   Q   And can you explain to the Jury what that
2   is?
3   A   Well, it is in fact a report of the DNA
4   analysis of the various items of evidence. And one of
5   these, this in particular is the swabbings from the
6   firearm.
7   Q   Okay.
8   A   This would be the 45 caliber H and K
9   pistol as fired by Officer King.
10  Q   Okay. I want to show you Plaintiff's
11  Exhibit numbers 37 and 38. Have you seen those
12  before?
13  A   Yes, sir, I have.
14  Q   Okay. And can you explain to the Jury
15  what those depict?
16  A   Yes, sir. They --
17  Q   You can show those --
18  A   Okay.
19  Q   -- publish those to the Jury.
20  A   Well, these -- these photographs, which
21  were prepared by the Minneapolis PD crime lab, these
22  show the areas where various DNA was found and the
23  results of that.
24  Q   Okay. Do they -- does that photograph
25  depict, according to the report, depict all of the

80

1 areas on Officer King's gun where there was swab to go
2 try to detect DNA?
3  A  Yes, sir.
4  Q  Okay.
5  A  This is where the swabs were taken.
6  Q  Okay. And those are all in the left side
7 of the gun?
8  A  Yes, sir.
9  Q  I mean, if you're right-handed holding
10 the gun, the swabbing would have been on the left
11 side, is that correct?
12  A  Yes, sir. As the right-handed shooter
13 would hold a gun, this is with it pointed away from
14 the shooter, this is on the left-hand side of the gun.
15  Q  And Officer King was left-handed or
16 right-handed, is that your understanding?
17  A  That's my understanding.
18  Q  Okay.
19  A  Also 38 would show the magazine for that
20 particular pistol. This magazine, for those that are
21 not familiar with such things, this magazine would
22 then fit into a slot or opening here in the handle of
23 the gun. There's a magazine weld that this fits up
24 into once you have loaded rounds of ammunition into
25 the magazine, then the magazine is inserted into the

81

1  pistol grip area. And once that is in place, the

2  weapon can be -- a live round could be chamber better

3  and the pistol could be fired when you release the

4  safety.

5   Q   All right. Now, in your review of

6  Officer King and Loonsfoot's testimony from their

7  depositions, do you recall whether Defendant King

8  testified that he struck Mr. Felder with the butt of

9  his gun?

10  A   Yes, sir. That's my recollection, that

11  he -- that he struck him in the back of the head.

12  Q   How many times?

13  A   Twice, I -- if my recollection is

14  correct.

15  Q   Okay.

16  A   He hit him hard twice.

17  Q   Okay. Would you, based on your

18  experience, would you reasonably expect an officer who

19  was hitting Mr. Felder on the back of the head with

20  the butt of his gun to leave a mark on the head?

21  A   Yes. He should have impact marks on the

22  back of his head --

23       MR. SKARDA: Objection, beyond the scope

24  of the expert report.

25  Q   I'll ask you hypothetically, based on

82

1   your years of experience and your review of the

2   autopsy report, is there any -- any mention in the

3   autopsy report of there being any marks on the back

4   Mr. Felder's head?

5       A    No, sir, there's not.

6       Q    In your review of Mr. Felder's 45

7   handgun, was there any DNA found -- of Mr. Felder's

8   found on the butt of the 45?

9       A    On the-- no, no, not on the bottom of the

10  magazine.

11      Q    Okay. Is that something that you would

12  expect, given the sworn testimony of the officer?

13           MR. SKARDA: Objection, beyond the scope

14  of the expert report.

15      A    It is what I would expect.

16      Q    That --

17      A    That there would be -- Felder's DNA

18  should be there on the butt if that's what was used to

19  strike him.

20      Q    Was Felder's, according to that report,

21  was Mr. Felder's DNA found anywhere on the gun?

22      A    Yes, in some of the areas marked here on

23  the left-hand side, Felder's DNA was found in those

24  areas.

25      Q    Can you identify from the report where

83

1  Mr. Felder's DNA was found?

2    A   That might take me a minute.

3    Q   Okay.

4    (Short Pause).

5    THE WITNESS: Would you mind taking a
6  little break?

7    MR. BEHRENBRINKER: Sure.

8    THE WITNESS: This will take me more time
9  than I thought.

10    THE VIDEOGRAPHER: Off the record at
11  1223.

12    (Whereupon a short recess was taken.)

13    THE VIDEOGRAPHER: On the record at
14  12:27.

15    THE WITNESS: Okay. So in reviewing this
16  and in going over the report in reference to the
17  pictures of the firearm: Then Dominic Felder's DNA
18  was not found on the -- either the bottom of the grip
19  swabs or the bottom of the magazine swabs, nothing
20  down in that area.

21    Mr. Felder's DNA was not seen from the
22  rear sight.

23    His DNA, Domino's DNA was found to be a
24  partial contributor to the trigger guard, to the
25  equipment rails and to the side of the slide, and also

84

1   the front sight.

2   These are the areas -- these are the

3   areas on the pistol where there were positive results

4   for Dominic Felder, front sight, the side of the

5   slide, that's front sight, side of the slide.

6   Also from this equipment rail here and

7   also partially on the trigger guard area (indicating).

8   Q   Okay. Now, is there any reference in the

9   autopsy report that there were any marks or any

10  evidence on the back of Mr. Felder's head to suggest

11  that he had been hit hard with the butt of the gun?

12  A   No.

13  Q   Okay. Would you -- I'm showing you

14  what's been previously marked as Plaintiff's Exhibit

15  33, 31 and 32. Have you seen those before? Excuse

16  me.

17  A   Yes, sir, I have. Exhibit 33 -- these

18  are not POB to be published, correct?

19  Q   That's correct. Unless --

20  MR. SKARDA: We style have the objection

21  to those three exhibits.

22  MR. BEHRENBRINKER: Yes, okay.

23  THE WITNESS: 33 is a photograph of the

24  back of the head of Dominic Felder

25  BY MR. BEHRENBRINKER:

85

1   Q   What does it show?

2   A   Plaintiff's Exhibit 33 shows -- it does

3 show a mark at the back of the left ear, and it also

4 partially shows another couple of marks over on the

5 left-hand side of the face.

6   Q   All right. Any marks on the back of the

7 head?

8   A   None that I can see in this photo.

9   Q   Okay. I want to ask you hypothetically,

10 if an individual you is holding a 45 caliber handgun

11 like that and he's right-handed and he's facing an

12 individual, and he were to hit that person on the --

13 on that person's right side of their face, would that?

14   A   Left-hand side of the face.

15   Q   On the --no, the person's-left side of

16 their face, you're right. Yeah.

17      Right-handed facing the person, hits them

18 on the left side of the face, what side of the gun is

19 going to contact that person's face?

20   A   The left-hand side of that gun.

21   Q   Okay. And if you hit the person hard

22 enough with the left side of that gun, is it probable

23 that DNA could be left on the weapon?

24   A   That's -- that's very reasonable to

25 assume.

86

1   Q   Okay. Is it probable based on your
2   experience?
3   A   I won't say that I have that much
4   experience with DNA analysis. But as far as
5   transferring blood material, skin, that kind of thing,
6   it's very reasonable to assume that if you -- if you
7   slap somebody up beside the head with a pistol that
8   you're going to have transfer of that DNA from the
9   person over to that side of the piston.
10  Q   Okay. Now, in this case, Officer
11  Loonsfoot testified at his deposition that Officer
12  King hit Dominic Felder several times with his gun,
13  correct?
14  A   Yes.
15  Q   And Officer King is right-handed?
16  A   Yes, that's what I've been led to
17  believe.
18  Q   And the DNA swabs were taken from the
19  left side of Officer King's gun?
20  A   Yes, sir, that's correct.
21  Q   And the left side of Mr. Felder's face
22  has contusions and wounds, correct?
23  A   Yes, sir.
24      MR. BEHRENBRINKER: Okay. I have nothing
25  further.

104

1    A    Yes.

2    Q    Item B, is it correct that that indicates

3    laceration in the webbing of the left, first and

4    second fingers?

5    A    Yes, sir. That's true. And I've seen

6    the photo of that down in this area (indicating).

7         And what I'm saying to you is, you

8    mentioned the front sight. That would -- that would

9    be away from the front sight area. And it also would

10   be down below where there would be any damage from the

11   slide.

12   Q    There was in fact a laceration, though,

13   correct?

14   A    Oh, yes.

15   Q    Yes.

16   A    There's some sort of cut.

17   Q    And there was -- Mr. Felder's DNA was on

18   the front sight, too, isn't that correct?

19   A    That's true.

20   Q    The photos that were introduced into

21   evidence of you showing the trajectories on the

22   dummies, on the forensics dummies, are you familiar

23   with those?

24   A    Which ones are you --

25   Q    Just in general, all the photographs?

105

1   A   Yes.

2   Q   Did you ever test the officers' version
3 of the incident with an individual or a dummy that was
4 in a dynamic situation that was moving around?

5   A   In essence, yes. That -- we're trying to
6 go through every possible permutation of this incident
7 to see what is likely and what's not likely; what's
8 possible and what's not possible.

9      And we did not lock onto a particular
10 version of an event without seriously considering
11 everything that we had at our disposal, the reports,
12 the clothing, the gun shot holes through the clothing,
13 the path of the wounds through the body.

14      All of those were taken into
15 consideration whenever we tried to show a photograph
16 of a particular trajectory.

17   Q   When you wrote your report, your opinions
18 were based on all of the available evidence, correct?

19   A   Correct.

20   Q   In your report you didn't mention any of
21 the DNA evidence or the lacerations to his hand, isn't
22 that correct?

23   A   Is the DNA not -- it's 38.

24   Q   You had the DNA notes, but you didn't
25 mention them in the text of your report, isn't that